United States District Court
for the
Southern District of Florida

| | |
|---|---|
| United States of America and the State of Florida *ex rel.* Miguel A. Fernandez, Jr., and Miguel A. Fernandez, Jr., individually, Plaintiffs, <br><br> v. <br><br> Miami Cancer Institute, and others, Defendants. | Civil Action No. 17-24051-Civ-Scola |

### Opinion Order on Defendants' Motion to Dismiss

This matter is before the Court on Defendants' Motion to Dismiss *qui tam* Relators Miguel A. Fernandez, Jr. and Becky Lehrer's (the "Relators") First Amended Complaint. (ECF No. 28.) The Relators filed a response (ECF No. 30), and Defendants replied (ECF No. 31). After reviewing the parties' written submissions, the record, and the applicable law, the Court **grants** the Defendants' motion to dismiss. (**ECF No. 28**.)

**I.   Background**

The Relators in this case brought a qui tam action against Defendants Advanced Medical Specialists, LLC (AMA), Miami Cancer Institute (MCI), Baptist Health South Florida Inc. (Baptist), Michael Zenner, M.D., Leonard Kalman, M.D., and Margarita Pons alleging violations of the False Claims Act, 31 U.S.C. §§ 372 *et seq.* (the "FCA"). The Relators allege that the Defendants submitted false claims to Medicare, Tricare, and Florida Medicaid and received reimbursements that should not have been paid.

Relator Lehrer, a mixing technician at AMS since 2008, was responsible for compounding cancer medications ordered by the group's physicians. (Compl. at ¶ 26, ECF No. 26). MCI was created in 2014 when the physicians of AMS joined Baptist. (*Id.* at ¶ 15.) Lehrer worked at MCI until 2018. (*Id.* at ¶ 28.) She was a Pharmacy Technician III when she left. (*Id.*)

Relator Fernandez began working for AMS in early 2014 before the merger with Baptist. He met Lehrer in the mixing room. He was also a mixing technician, responsible for compounding medications ordered by the physicians. (*Id.* at ¶ 32.) In March 2016, as part of MCI, Fernandez was made Inventory Technician

and given the responsibility of maintaining and reconciling the inventory of medications used by MCI. (*Id.* at ¶ 34.) Fernandez was terminated on June 28, 2016. (*Id.* at ¶ 36.) Lourdes Alonso was the mixing room supervisor during this time. (*Id.* at ¶ 89.)

In the mixing room of the hospital's pharmacy, Relators would use the pharmacy's stock to prepare syringes and I.V. bags according to the physicians' orders. (*Id.* at ¶ 80.) Liquid medications are packaged by the manufactures in singe-dose vials (SDVs). SDVs are intentionally overfilled by the manufacturer to ensure that a full dose can be withdrawn. For example, a vial which contains a recommended dose of 1 mL may have 1.1 mL of liquid, the "overfill," to ensure that a full dose can be withdrawn if some product spills or remains as residue on the vial. (*Id.* at ¶ 82.) When a doctor orders a specific medication, the pharmacist may use the entire vial, or only part of it to fill the order. For example, a doctor may ask for 95 units of a drug, but the SDV contains 100 units. (*Id.* at ¶ 87.) In this scenario, the CDC's guidelines indicate that the "remainder" left over in the vial should be discarded. (*Id.* at ¶ 85.) If the doctor later asks for a 5 unit dose, the pharmacy should use a *new* vial to fill this new order. To incentivize providers to follow the CDC's guidelines, Medicare covers the total cost of the SDV, even if less than the full vial is used. (*Id.* at ¶ 87.) The provider is supposed to bill for the discarded portion using a special code. (*Id.* at ¶ 87.) The remainders are not used because the medications can easily spoil or become contaminated once the seal is broken. (*Id.* at ¶ 86.)

According to the Relators, the mixing room at AMS, and later MCI, was using the overfills and remainders to fill orders, but billing as if they had not. Using overfill and remainders to fill orders, instead of using a new vial, allowed AMS/MCI to bill for an additional vial without actually using it. For example, the mixing room supervisor required technicians to fill orders for 101 mL of a medication by using a 100 mL vial. This meant that they were filling the order by relying on the overfill instead of opening a new vial and taking 1 mL from a new vial. They would then bill for the 100 mL vial *and* the 1 mL vial but the 1 mL vial was still in their inventory. They would later bill this 1 mL vial, once it was actually used, to a different patient. With regard to remainders, Alonso instructed technicians not to discard remainders. Instead, technicians were instructed to use two open vials of 5 mL to fill an order for 10 mL. (*Id.* at ¶ 91.) The bill would reflect a new 10 mL vial, but they were really using old vials while the 10 mL vial remained in inventory. This practice regularly resulted in discrepancies between the medications in inventory and what the computerized records reflected. (*Id.* at ¶ 93.) Alonso would manually reconcile those differences on a weekly basis by editing the computer data. (*Id.*)

Relators also recall that when a patient could not use all of his or her medication that day because of nausea or an adverse reaction, the practice was to return the medication to the mixing room to use for other patients, even though it had already been billed to the account of the first patient. (*Id.* at ¶ 99.) If another patient needed the same medication, the old I.V. bag or vial was used and billed (a second time) to the new patient. (*Id.* at ¶ 101.)

According to the Relators, a supervisor or manager entered the orders into the pharmacy's electronic records system, Lynx. (*Id.* at ¶ 133.) The order would be filled using the overfill and remainders but the Lynx record would indicate that a fresh stock was used, even if it was not. (*Id.*) That information was then sent via Lynx to the Accounting Department. The Accounting Department created the bills that were then sent to insurers, including Medicare, Tricare, and Florida Medicaid. (*Id.* at ¶ 134.)

During his time in the mixing room, Relator Lehrer heard Alonso make comments such as, "If I'm going to prison you're all going to prison, too." Alonso also said that she was "saving the hospital millions of dollars." (*Id.* at ¶¶ 94-95.) Relators recall that at some point in late 2014 or early 2015, Alonso began to "stage" orders. (*Id.* at ¶ 114.) Instead of allowing the technicians to choose which vials to use, she would retrieve the vials from storage and hand them to the technician directly. (*Id.* at ¶ 114.) This helped Alonso have more control over the inventory and the fraudulent scheme. (*Id.* at ¶ 115.)

In March 2016, Fernandez became inventory technician for MCI, with primary responsibility for reconciling and maintaining the pharmacy's inventory. (*Id.* at ¶ 123.) In this position, he became acutely aware of the inventory discrepancies cause by Alonso's practices. On April 27, 2016, Fernandez requested a meeting with the Director of Human Resources for Baptist. (*Id.* at ¶ 124.) She directed him to bring the issue to his supervisors. Fernandez confronted Ann-Lori Perez, his supervisor at the time, who had continued Alonso's practices. On April 28, 2016, Fernandez was instructed to change patients' charts to reflect the quantities that should have been used. Fernandez refused to do this. (*Id.* at ¶ 137.) Fernandez continued to report inventory issues to Perez. Fernandez was placed on a performance improvement plan on June 2, 2016. (*Id.* at ¶ 139.) On June 24, 2016, Fernandez met with Anay Moscu, mixing room manager, and the Director of Human Resources was also present. Fernandez spoke about the issues in the pharmacy during that meeting. He was then placed on administrative leave and terminated on June 28, 2016. (*Id.* at ¶ 143.)

### II. **Legal Standard**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

### III. **Pleading Requirements Under Rule 9(b)**

"Generally, federal civil complaints need only state a short and plain statement of the claim showing that the pleader is entitled to relief." *U.S. ex. Rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F. 3d 1301, 1308 (11th Cir. 2002). The Eleventh Circuit, however, applies the heightened pleading requirements of Rule 9(b) to actions under the FCA. *Id.* at 1308-9. Under 9(b), the plaintiff must plead "facts as to time, place, and substance of the defendant's alleged fraud, specifically, the details of the defendants' allegedly fraudulent acts, when they occurred and who engaged in them." *Id.* at 1310.

Under the FCA, the plaintiff must allege that the defendant "actually submitted a false claim, and by extension that the government actually paid. The submission of a false claim is not a ministerial act, but the *sin qua non* of a False Claims Act violation." *United States ex rel. Aquino v. University of Miami*, 250 F. Supp. 3d 1310, 1329 (S.D. Fla. 2017) (Williams, J.) (quoting *Clausen*, 290 F.3d at 1311). The plaintiff cannot "merely describe a private scheme in detail [and] then [] allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* It is critical that the plaintiff include allegations about the ultimate billing of the false claim, either from first

hand knowledge or some other "indicia of reliability." *Id.* "[A] relator must show that the defendant actually submitted claims and that there was a nexus between the alleged improper practices and the submission of those claims." *Id.*

The Eleventh Circuit found the requisite indicia of reliability in *U.S. ex. rel. Mastej v. Health Management Assocs.*, 591 Fed. App'x 693 (11th Cir. 2014). Although the Court noted that Mastej did not provide specific details regarding the "dates, frequency, or amounts" of any actual claim, Mastej was in a "position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge." *Id.* For example, as Vice President of the defendant company, Mastej attended case management meetings in which Medicare patients and *billing* were discussed. *Id.* "[E]very patient was reviewed, including how the services were being billed to each patient . . . Mastej was intimately familiar with the payor mix at the hospitals, and the Medicare billing and payments at the hospitals[.]" *Id.* Because of his position, Mastej had unique knowledge of the hospital's revenues, billing practices, and payors, giving his complaint the requisite indicia of reliability under Rule 9(b). *Id.* at 708-9.

## IV. Analysis

### A. The False Claims Act

The False Claims Act permits private individuals to file a *qui tam* action, or whistleblower complaint, against any person who:
(1) Knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval;
(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim.

31 U.S.C. § 3729(a)(1)(A)-(B). The United States Government is given a specific amount of time to intervene and prosecute the case. If, as here, the Government does not assert its right to take over the case for the relator (the plaintiff), the relator can proceed on his own and recover between 25 and 30 percent of any money recovered from a settlement or judgment. *Id.* § 3730(d).

### B. Counts I – VI of the Relators' Complaint

The Defendants' motion to dismiss argues that the Relators' complaint must be dismissed because it lacks the particularity required under Rule 9(b). (ECF No. 28 at 4-7.) According to the Defendants, Relators failed to make allegations about any specific claim actually submitted to the government, including the names of patients, the payors, the amount that was falsely billed, and the dates. (*Id.* at 5.) The Relators do not deny that they have not provided this information. Instead, they ask this Court for a more "relaxed application of

Rule 9(b)" based on their firsthand knowledge of and participation in the scheme. (ECF No. 30 at 11.)

There is no question that the Relators have not provided many details regarding the actual submission of false claims to Medicare. The question is whether their knowledge and participation in the scheme provides the indicia of reliability necessary to satisfy rule 9(b). *See Mastej*, 591 Fed. App'x at 707. "Whether a complaint alleges sufficient indications of reliability that actual claims were submitted is performed on a case-by-case basis." *Id* at 708. The Relators, as pharmacy technicians, participated directly in the scheme as described in the complaint. Although their firsthand knowledge allows them to provide significant detail about the scheme, the complaint fails to allege any personal knowledge that the Defendants actually submitted false claims to Medicare. The complaint only includes two paragraph about the "billing process." (ECF No. 26 at ¶¶ 133-134.) In this section, Relators describe the general billing process. An order would come to the pharmacy and one of the supervisors would enter it into Lynx, the pharmacy's electronic records system. (*Id.* at ¶ 133.) The order would be filled using the overfill and remainders but the Lynx record would be created indicating that a fresh stock had been used. (*Id.*) "That information was then sent via Lynx to the Accounting Department, which created fraudulent bills that were then sent to insurers, including Medicare, TRICARE, and Florida Medicaid." (*Id.* at ¶ 134.) The Court finds that this is insufficient to satisfy the requirements of Rule 9(b).

Unlike the relator in *Mastej,* the Relators do not have any firsthand knowledge or experience with the hospital's billing practices, what percentage of the hospital's patients are enrolled in government funded programs, and whether these fraudulent claims were actually billed. The Relators rely on the assumption that hospitals generally bill for their services and medications. (ECF No. 30 at 13 ("th[e] allegations satisfy Rule 9(b) and make out a claim under the FCA *unless* one makes the illogical assumption that Defendants made no claims whatsoever on the government programs.").) This, however, is insufficient. *See United States ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1332-33 (S.D. Fla. 2017) (Williams, J.) (dismissing complaint where relator failed to allege that she had firsthand knowledge of billing process or include allegations of actual claims submitted for reimbursements). Relators themselves include a citation to *US. ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.*, 906 F. Supp. 2d 1264 (N.D. Ga. 2012). In *Saldivar,* the Court denied the motion to dismiss based on the relator's allegations regarding misuse of prescription overfills. 906 F. Supp. 2d at 1277. However, the relator in *Saldivar* alleged that in "October of 2008, Fresenius billed Medicare for a total of 762,000 units, even tough it incurred acquisition costs for only 680,000 of those units." *Id.* at 1270. Furthermore, the

Relator "compiled reports that compared total doses of [medications] administered with total doses in inventory, noting separately the total percentage of overfill used for each drug. According to Relator, his clinical manager informed him that those documents were used as the basis upon which Defendant billed for reimbursement." *Id.* at 1277. Here, the Relators do not make any such allegations.

Accordingly, the Court dismisses Counts I, II, and III brought under 31 U.S.C. §§ 3729(a)(1)(A), (B), and (C), respectively. *See Burkes v. Dylewski*, No. 14-cv-22079, 2016 WL 9526692, at *4 (S.D. Fla. May 3, 2016) (Ungaro, J.) ("Therefore, Rule 9(b) requires that the actual presentment of a claim under 31 U.S.C. §§ 3729(a)(1)(A)-(G) be pleaded with particularity."). Moreover, Counts IV, V, and VI, based on the Florida False Claim Act, are also dismissed because "the standards under both the Florida Act and the Federal Act are the same." *U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007) (Cohn, J.). *See also U.S. Space Coast Medical Assocs.*, 94 F. Supp. 3d 1250, 1252 n.4 (M.D. Fla. 2015) ("The Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard.").

### C. Counts VII – IX of the Relator's Complaint

Counts VII, VIII, and IX are asserted by Relator Fernandez for retaliation by the Defendants. "In order to show retaliation under the False Claims Act, the plaintiff must show that she was discriminated against in the terms and conditions of [his] employment for engaging in protected activity." *United States v. HPC Healthcare, Inc.*, 723 Fed. App'x 783, 791 (11th Cir. 2018). Under the FCA, "protected activity" is defined as "lawful acts done by the employee . . . in furtherance of an action under the False Claims Act or other efforts to stop 1 or more violations of the False Claims Act." *Id.* A claim of retaliation requires the plaintiff to establish "a causal connection between the retaliation and the protected activity; that is, [he] must show that the retaliation was because of the protected activity." *Id.* At 792 (quotations and citations omitted).

Fernandez alleges that he brought his "findings regarding the inventory discrepancies" to the pharmacy supervisor. (ECF No. 1 at ¶ 136.) "He informed her that not only did the pharmacy's practices cause billing and inventory issues, they also put patients at serious risk." (*Id.*) This is insufficient to plead a retaliation claim under the FCA. To state a claim for retaliation, Fernandez must allege that he engaged in protected activity. "The prototypical example of conduct protected by the FCA is the filing of an FCA claim." *Ortino v. School Bd. of Collier Cty.*, No. 14-cv-693-FtM-29CM, 2015 WL 1579460, at *2 (M.D. Fla. April 9, 2015). Protected activity may also include acts done "in furtherance of" an action under the FCA or other efforts to stop violations of the FCA. *HPC Healthcare,* 723

Fed. App'x at 791. The FCA also "prohibits retaliation against an employee who put [his] employer on notice of possible FCA litigation by making internal reports that alert the employer to fraudulent or illegal conduct." *Ortino*, 2015 WL 1579460 at *2. Here, Fernandez merely alerted his supervisors of a "billing and inventory" problem. (ECF No. 1 at ¶ 136.) "[M]ere reporting of wrongdoing to supervisors, without alleging that the wrongdoing constitutions *fraud on the government*, does not qualify as protected conduct." *Ortino*, 2015 WL 1579460 at *2 (emphasis added). Fernandez does not allege that he told his supervisors that their actions constituted fraud on the government or that they might be sued in a quit tam action. Therefore, the Court dismisses Count VII. Fernandez's retaliation claim under Florida's False Claims Act (Count VIII) "will be dismissed on the same grounds." *United States v. LifePath Hospice, Inc.*, No. 10-cv-1061-T-30TGW, 2016 WL 5239863, at *10 (M.D. Fla. Sept. 22, 2016).

The Court declines to exercise supplemental jurisdiction over the remaining state law claim in Count IX as all federal claims have been dismissed. *See Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1373 (S.D. Fla. 2009) (Martinez, J.) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Therefore, the Court dismisses Count IX.

## V. Conclusion

Based on the foregoing, the Court **grants** the Defendants' motion to dismiss the Relators' complaint for failure to state a claim (**ECF No. 28**). The Relators' complaint is dismissed without prejudice. The Relators' request "alternatively" seeking leave to amend the complaint is denied as improper. *See Newton v. Duke Energy Florida, LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("[W]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."); *Avena v. Imperial Salon & Spa, Inc.,* No. 17-14179, 2018 WL 3239707, at *3 (11th Cir. July 3, 2018) ("[W]e've rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend."). The Court thus dismisses the complaint without leave to amend.

The Clerk is directed to **close** this case.

**Done and ordered**, in Chambers, in Miami, Florida on May 6, 2019.

Robert N. Scola, Jr.
United States District Judge